Meredith Holley
Meredith@ErisResolution.com
Law Office of Meredith Holley
207 E 5th Avenue, Suite 254
Eugene, OR 97401
Phone: (458) 221-2671
Fax: (833) 352-3615

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| APRIL HENRY,<br><br>        Plaintiff,<br><br><br>        vs.<br><br><br>LIFE CARE CENTERS OF AMERICA, INC.,<br>DBA LIFE CARE CENTER OF COOS BAY,<br>        Defendant. | Case No.<br><br>COMPLAINT<br>(Violation of Title VII, 42 USC §<br>2000e-2; ORS 659A.030;<br>Negligence)<br><br><br><br>*Demand for Jury Trial* |

### INTRODUCTORY STATEMENT

1.

This case arises from Defendant Life Care Centers of Coos Bay failing to create a safe environment for patients and staff, free from sexual harassment and assault. Defendant knew that Resident JH had a history of inappropriate sexual behavior and had groped nurses at a previous facility. When Resident JH began harassing and groping staff in Defendant's facility, Defendant failed to take appropriate steps

COMPLAINT – Page 1

to stop the harassment. This resulted in Resident JH groping Plaintiff April Henry, a licensed practical nurse employed by Defendant. After April Henry reported the harassment to Defendant, Defendant failed to respond to her requests to make the workplace safe and constructively discharged her.

## JURISDICTION AND VENUE

### 2.

This matter arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and related law. Supplemental jurisdiction over related state law claims is proper under 28 U.S.E § 1367.

### 3.

The events underlying Plaintiff's claims took place in Coos County, Oregon, making venue proper in the District of Oregon, Eugene Division.

## PARTIES

### 4.

Plaintiff April Henry is a resident of Coos County, Oregon.

### 5.

Defendant Life Care Centers of America, Inc., is a foreign corporation with its principle place of business in Tennessee, and conducts regular, sustained business in Lane County and Coos County, Oregon.

## FACTUAL ALLEGATIONS

### 6.

On September 15, 2015, Defendant hired April Henry as a Licensed Practical Nurse (LPN). April Henry is a woman.

7.

Defendant is an inpatient and outpatient 24-hour skilled nursing facility providing services for residents with dementia and other impairments.

8.

In late 2015 or early 2016, Defendant admitted Resident JH, who had dementia. Resident JH was placed in a semi-private room with another resident. Resident JH had a history of sexually harassing women in other facilities. Before Defendant admitted Resident JH, another facility reported to the police that Resident JH was viewing child pornography on his iPad. The Coos Bay Police Department investigated, Incident Report P20152724, and Resident JH's family removed his iPad to prevent Resident JH from viewing child pornography in the future.

9.

On the day Defendant admitted Resident JH, Resident JH's brother-in-law told Defendant's Nursing Director, Irene Reed, that Resident JH had inappropriately touched female staff where he lived before. Around 3 months after Resident JH was admitted, Defendant's staff reported to Nursing Director Reed that Resident JH was having sexually inappropriate behavior, including touching them inappropriately. Staff reported sexually inappropriate behavior either directly to Nursing Director Reed or in a nursing chart note for Resident JH.

10.

At some time after Defendant admitted Resident JH to its facility, Resident JH's iPad was returned to him and he resumed watching pornography. To the best of Plaintiff's knowledge and belief, two times, Resident JH's iPad automatically connected to the large TV screens in the common area of Defendant's facility, exposing staff and other residents to the pornography on Resident JH's iPad.

COMPLAINT – Page 3

11.

In spring 2016, April Henry encountered Resident JH for the first time. Ms. Henry was giving another resident medication in the cafeteria of Defendant's facility. She stood between the two residents' wheelchairs, and Resident JH grabbed Ms. Henry between her legs. Ms. Henry jumped away and said, "Don't do that again!" Ms. Henry asked other nurses about Resident JH's care plan and found out this type of behavior was common, but that there was no protocol for preventing it. She saw that Resident JH's care plan included that staff should notify a supervisor of any issues related to his viewing of pornography on his iPad. She tried to stay away from Resident JH.

12.

Other nurses and certified nursing assistants (CNAs) described to Ms. Henry sexually harassing behavior from Resident JH, such as touching them inappropriately, being erect as a CNA changed his briefs, and acting inappropriately in the shower. These conversations happened approximately more than once a week after the first incident Ms. Henry experienced.

13.

In 2016, after the first incident, Ms. Henry was assigned shifts in Resident JH's hall. As instructed by the care plan, Ms. Henry reported to Defendant's Executive Director, Jesse Winkler, that she was not comfortable attending to Resident JH while he watched pornography on his iPad. Executive Director Winkler told Ms. Henry that she could ask Resident JH to turn his iPad off while she attended him, but that Resident JH could not be restricted in his viewing of pornography. Ms. Henry talked to Executive Director Winkler about Resident JH's inappropriate sexual behaviors, and Executive Director Winkler told Ms. Henry that she could say,

"no," to Resident JH. Ms. Henry was given no training regarding steps she could take to prevent Resident JH's sexual harassment other than that she could ask him to agree not to touch her and she could tell him "no" and "stop" when he did.

14.

After Ms. Henry started being assigned to Resident JH's hall, other staff members told her staff had complained about Resident JH's sexually harassing behavior to Defendant's administrators, that administrators had responded by talking to Resident JH, but that he had quickly resumed sexually harassing behaviors. Administration had taken no further action. At this time, staff had conversations with Ms. Henry about Resident JH's behavior around every other shift.

15.

Defendant did not train Ms. Henry or other staff or residents regarding Resident JH other than giving them access to Resident JH's care plan. To the best of Plaintiff's information and belief the care plan was as follows: Introduce yourself and explain the purpose of your visit; ask Resident to turn off his iPad; obtain Resident's agreement not to touch you; if touched or groped, step away and report to the Nursing Director; if the Nursing Director is unavailable write a note in the 24-hour report.

16.

In late spring 2016, Ms. Henry started to be assigned to increasing shifts in Resident JH's hall, another nurse told Ms. Henry she had seen Resident JH watching child pornography. That nurse told Ms. Henry she was afraid to report the incident to administration. She said that administration had responded to complaints in the past by telling nursing staff that the only problem with Resident JH's behavior was nursing staff was not following his care plan and any problem was blamed on the complaining nurse in that way.

17.

When Ms. Henry gave Resident JH medication, which happened every shift she worked on his hall, he caressed her arms and sometimes kissed her hands. Each time, she moved away or waved her hands in front of Resident JH's hands, saying, "I do not like that," "No," "Stop," and other statements to protect herself and make it clear she did not want him to touch her. Resident JH's sexually harassing behavior continued.

18.

In 2017, Ms. Henry was assigned increasing shifts in Resident JH's hall. She told the Staff Development Coordinator that she was having anxiety attacks and was not comfortable working in that hall because of Resident JH. The Staff Development Coordinator told Ms. Henry that she could not do anything about it but that Ms. Henry should talk to Nursing Director Reed or Executive Director Winkler.

19.

Around early March 2017, Ms. Henry told Executive Director Winkler that working on East Hall (Resident JH's hall) was difficult for her and every time she saw her name on that hall, her heart raced and she needed to do breathing exercises. Three or four times Ms. Henry tried to talk with Executive Director Winkler about Resident JH, but she began to cry. She continued to be assigned to East Hall.

20.

On March 28, 2017, Ms. Henry entered Resident JH's room to give him medication. Another nurse was in the room, attending to Resident JH's roommate. As directed by Resident JH's care plan, Ms. Henry announced the reason for her visit, requested that Resident JH turn off his iPad, and asked for his agreement that he not touch her. As was typical, Resident JH did not turn off his iPad, but Ms. Henry had been

trained that she was not allowed to refuse to attend to any resident who needed care. She continued to enter the room and provide medication to Resident JH.

21.

Resident JH was watching a low-quality video on his iPad. He began caressing Ms. Henry's arms. She told him to stop and that it was not appropriate, but she was holding his feeding tube and had been trained never to stop care for a resident in a way that might harm the resident. Suddenly, Resident JH reached between Ms. Henry's legs so that his hand was wrapped round her thigh with his thumb on her buttocks. He pulled her closer to his wheelchair. Ms. Henry said, "That is not okay. You need to stop right now!" Then, he put his hand on her buttocks. Ms. Henry saw on his iPad that there were little girls running down a grassy hill, and she was afraid that he was watching child pornography.

22.

Ms. Henry finished treating Resident JH and then went to a closet, where she cried. All administration was in a meeting and not available at the time of this incident, and so as she had been trained, Ms. Henry wrote a note in Resident JH's 24-hour care notes regarding the incident. Based on past experience, she understood that she would not be allowed to go home, and so she finished her shift. She reported the incident to the nurse who came on duty after her.

23.

The next day, March 29, 2017, Ms. Henry did not want to return to work, but she wanted to clarify her note in the 24-hour report, make sure the incident was addressed, and try to protect other staff. Administration met in the mornings, and so Ms. Henry attended that meeting to report the sexual harassment.

COMPLAINT – Page 7

24.

Ms. Henry talked to Theresa Hineline, the Resident Care Manager, before the meeting and told her what had happened. Ms. Hineline said, "Oh, he's doing that again? You definitely need to make sure you let Irene [Reed, Director of Nursing] know."

25.

In the meeting, Ms. Henry, crying, told Nursing Director Reed what happened. Rather than address Resident JH's behavior, Director Reed accused Ms. Henry of failing to follow Resident JH's care plan. Ms. Henry explained that she had followed the care plan.

26.

Nursing Director Reed and the head of physical therapy mentioned they had "high tolerance" for sexually harassing behavior and that they could give Ms. Henry tips about how to have a better response after patients sexually harassed her.

27.

Executive Director Winkler did not look at Ms. Henry during the conversation. Then, he asked, "Did you tell him that your breasts aren't for playing with and that it wasn't appropriate?" Ms. Henry told Executive Director Winkler that the incident had not involved her breasts and that she had told Resident JH to stop many times.

28.

Ms. Henry told the administration that even if they were not concerned about Resident JH touching her, they should at least be concerned at the possibility that he was watching child pornography. Initially, Nursing Director Reed did not seem concerned. Ms. Henry explained that possessing child pornography was a crime, and that Defendant could be liable for it. The head of physical therapy agreed with Ms. Henry, and it was not until then that Nursing Director Reed seemed concerned.

29.

Ms. Henry told the directors that she did not feel safe, that she could not finish her shift, and that she needed to see a doctor. Nursing Director Reed told Ms. Henry she was not allowed to leave. Ms. Henry counted down a narcotics drawer and again told Nursing Director Reed she needed to leave. Nursing Director Reed again tried to force Ms. Henry to stay, but Ms. Henry felt it was not safe for her and left.

30.

That night, Nursing Director Reed texted Ms. Henry to say Ms. Henry could work in a different hall the next day. Ms. Henry told Director Reed she was not comfortable going back to work. Director Reed texted saying she had the shift covered, but that Ms. Henry needed to be at her regular shift on April 1, 2017.

31.

On March 30, 2017, Ms. Henry went to the police station and reported her experience to a detective. The detective told her Defendant had reported the incident, and that while the detective was investigating, another nurse told him that Resident JH had sexually harassed and assaulted her as well. In Coos Bay Police Department Incident Report P20171260, Detective Hatzell notes concern that Resident JH would not be mentally able to aid in his defense, but would have been prosecuted had he been. Detective Hatzell records this conversation with Executive Director Winkler: "I also expressed my concern that [Resident JH]'s free reign to access and review of pornography may be a major contributing factor in his inappropriate touching of female staff members. . . . I recommended that Mr. Winkler take some kind of action to block [Resident JH] from accessing pornography. I was shocked when Mr. Winkler told me that it was specifically written in [Resident JH]'s resi-

dential agreement that he would be granted access to view pornography and in essence Mr. Winkler didn't believe he could curtail [Resident JH]'s right of sexuality."

32.

On March 31, 2017, Ms. Henry checked herself in to an inpatient care facility. Ms. Henry had previously been diagnosed with depression, post-traumatic stress disorder, and anxiety. The assault from Resident JH exacerbated her symptoms, and she had started to experience suicidal thoughts. She was released from the hospital on April 5, 2017.

33.

While in the hospital, Ms. Henry did not have access to her phone, and so her husband told Executive Director Winkler by text that she would not be able to go back to work right away. Defendant required Ms. Henry to fill out medical leave paperwork, which she did when she was released.

34.

On April 19, 2017, Ms. Henry wrote Respondent a letter requesting her personnel records. She said that because Defendant's response to her complaint, she believed she had been fired. She stated that she loved her job and that she wanted to continue working if Defendant could provide a safe workplace, without sexual harassment.

35.

Executive Director Winkler sent Ms. Henry a letter dated April 24, 2017, again refusing to acknowledge the sexual harassment and blaming Ms. Henry for Resident JH's behavior, saying Ms. Henry would be required to meet with Nursing Director Reed to discuss "the care plan that is in place with the resident that upset you prior to your leave of absence. As you were not following the care plan at the time

of the incident, it will be imperative that you do so in the future in order to avoid
any further incidents." At no time did Defendant ask Ms. Henry about her proce-
dures in following the care plan. Although other nurses reported harassment from
Resident JH before and after his assault of Ms. Henry, Defendant appeared to only
assume Resident JH's behavior was Ms. Henry's fault. Ms. Henry followed Resi-
dent JH's care plan throughout her care of him, and the care plan failed to prevent
or address the sexual harassment.

36.

On April 26, 2017, Ms. Henry sent another letter to Executive director Winkler,
requesting specific actions related to the sexual harassment to make the workplace
safe. Ms. Henry stated that if she did not hear back within the month of May, she
would understand that Defendant continued to be unwilling to make her job safe.
Defendant did not respond to this letter.

37.

On May 16, 2017, the Nursing Board suspended April Henry's nursing license and
put into place a monitoring plan because of her hospitalization related to the sexual
assault.

38.

On August 16, 2017, April Henry filed claims with the Oregon Bureau of Labor
and Industries and the Federal Equal Employment Opportunity Commission. On
August 16, 2018, the Oregon Bureau of Labor and Industries issued to Ms. Henry
a 90-day right to sue letter.

## FIRST CLAIM FOR RELIEF

## TITLE VII, 42 U.S.C. 2000E-2 – HOSTILE ENVIRONMENT

### 39.

Plaintiff April Henry repeats and realleges paragraphs 1-38 as though fully set forth.

### 40.

Defendant violated Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e-2, in the following:

    a. Resident JH engaged in unwelcome conduct of a sexual nature, and directed it at women, including Ms. Henry, because of their sex.

    b. Resident JH's unwelcome verbal or physical conduct was sufficiently severe or pervasive to have the purpose or effect of unreasonably interfering with female nurses', including Ms. Henry's, work performance or creating a hostile, intimidating or offensive working environment.

    c. Defendant or its agents knew or should have known of Resident JH's conduct and did not take immediate or appropriate corrective action. Defendant had control over Resident JH's care plan, environment, and other factors including medication, therapeutic treatment, and residential agreement.

### 41.

As a result of Defendant's violations, April Henry was required to go on medical leave and miss work, resulting in wage loss to be proven at the time of trial.

### 42.

Defendant's violations caused April Henry to be admitted to the hospital and require follow up medical care, resulting in medical expenses to be proven at the time of trial.

43.

In addition to her wage loss and hospitalization, April Henry experienced exacerbation of her mental health issues including depression, post-traumatic stress disorder and anxiety. She experienced suicidal thinking. Because of her hospitalization, she was monitored by the Nursing Board, which interfered with her ability to freely resume nursing again. This experience and the emotional trauma around it interfered with her relationships with her husband and children. Defendant's blame that Resident JH's sexual harassment was Ms. Henry's fault, and must be a result of her not following the care plan, was an additional betrayal and increased her distress. All of this resulted in emotional distress and other damages to be proven at the time of trial.

## SECOND CLAIM FOR RELIEF

## ORS 659A.030 – HOSTILE ENVIRONMENT

44.

Plaintiff April Henry repeats and realleges paragraphs 1-43 as though fully set forth.

45.

Defendant violated ORS 659A.030:

    a.  Resident JH engaged in unwelcome conduct of a sexual nature, and directed it at women, including Ms. Henry, because of their sex.

    b.  Resident JH's unwelcome verbal or physical conduct was sufficiently severe or pervasive to have the purpose or effect of unreasonably interfering with female nurses, including Ms. Henry's, work performance or creating a hostile, intimidating or offensive working environment.

    c.  Defendant or its agents knew or should have known of Resident JH's conduct and did not take immediate or appropriate corrective action.

Defendant had control over Resident JH's care plan, environment, and other factors including medication, therapeutic treatment, and residential agreement.

46.

Defendant's violations caused Plaintiff's wage loss, medical expenses, emotional distress, and other harms as described more fully above and to be proven at the time of trial.

### THIRD CLAIM FOR RELIEF

### TITLE VII, 42 U.S.C. 2000E-2 – WRONGFUL TERMINATION

### OR CONSTRUCTIVE DISCHARGE

47.

Plaintiff April Henry repeats and realleges paragraphs 1-46 as though fully set forth.

48.

By letters dated April 19 and 26, 2017, Ms. Henry notified Defendant of its discriminatory and intolerable work environment and requested that the work environment be made safe. Ms. Henry notified Defendant that if she did not hear back, she would understand her employment was terminated. Defendant did not respond to Ms. Henry and thereby terminated her employment because she was a woman or because she complained of sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, 42, U.S.C. 2000e-2.

49.

In the alternative, if Ms. Henry's employment was not terminated, the conditions of Ms. Henry's employment as described above were sufficiently intolerable, a reasonable employee in Ms. Henry's position would have resigned, and Ms. Henry

was constructively discharged because of a discriminatory working environment under Title VII of the Civil Rights Act of 1964 42 U.S.C. 2000e-2.

50.

Defendant's violations caused Plaintiff's wage loss, medical expenses, emotional distress, and other harms as described more fully above and to be proven at the time of trial.

## FOURTH CLAIM FOR RELIEF

### ORS 659A.030 – WRONGFUL TERMINATION OR CONSTRUCTIVE DISCHARGE

51.

Plaintiff April Henry repeats and realleges paragraphs 1-50 as though fully set forth.

52.

By letters dated April 19 and 26, 2017, Ms. Henry notified Defendant of its discriminatory and intolerable work environment and requested that the work environment be made safe. Ms. Henry notified Defendant that if she did not hear back, she would understand her employment was terminated. Defendant did not respond to Ms. Henry and thereby terminated her employment because she was a woman or because she complained of sexual harassment, in violation of ORS 659A.030.

53.

In the alternative, Defendant intentionally created or maintained discriminatory working conditions for women, the working conditions were so intolerable that a reasonable person in Ms. Henry's position would have resigned because of them, and Defendant knew or should have known that Ms. Henry was certain, or substantially certain, to leave employment as a result of the working conditions, and Ms.

COMPLAINT – Page 15

Henry was constructively discharged because of a discriminatory working environment under ORS 659A.030.

54.

Defendant's violations caused Plaintiff's wage loss, medical expenses, emotional distress, and other harms as described more fully above and to be proven at the time of trial.

## FIFTH CLAIM FOR RELIEF – NEGLIGENCE

## (COMMON LAW)

55.

Plaintiff April Henry repeats and realleges paragraphs 1-54 as though fully set forth.

56.

Defendant knew or should have known that Resident JH had hypersexualized, sexually inappropriate behaviors, and that he presented a danger of sexual harassment and assault to other patients, residents, and staff.

57.

Defendant was negligent in one or more of the following:

a.  Failing to create a care plan for Resident JH that adequately protected staff and other patients from sexual harassment and assault;

b.  Failing to adequately train nursing staff in order to protect themselves and patients, including Resident JH, from Resident JH's hypersexualized, inappropriate, sexually harassing and assaultive behaviors and the consequences of those behaviors;

c.   Allowing Resident JH to continue to watch pornography without restrictions, when it knew watching pornography made Resident JH more of a danger to staff and patients; and/or

d.   Failing to schedule and/or hire adequate numbers of staff at its facility to handle Resident JH, when it knew he presented a danger to female staff.

58.

Defendant's violations caused Plaintiff's wage loss, medical expenses, emotional distress, and other harms as described more fully above and to be proven at the time of trial.

///

///

///

///

///

///

_____

WHEREFORE, Plaintiff April Henry prays for judgment against Defendant as follows:

a.   Economic damages in the form of lost wages and benefits in an amount to be determined at trial, and prejudgment interest thereon;

b.   Economic damages in the form of medical expenses in an amount to be determined at trial, and prejudgment interest thereon;

c.   For fair and reasonable compensatory damages to be determined at the time of trial;

    d.   Punitive damages in an amount to sufficient to punish and deter similar

         conduct to be determined by the jury at the time of trial; and

    e.   Reasonable attorney fees and costs incurred herein.


DATED this 12th day of November, 2018.

Meredith Holley, OSB #125647
Meredith@ErisResolution.com
LAW OFFICE OF MEREDITH HOLLEY
207 E 5th Avenue, Suite 254
Eugene, OR 97401
Telephone: (458) 221-2671
Fax: (833) 352-3615
Attorney for Plaintiff